**CABINET FOR HUMAN RESOURCES,**
**Appellant,**

v.

**WOMEN'S HEALTH SERVICES,**
**INC., Appellee.**

**No. 93–CA–0640–MR.**

Court of Appeals of Kentucky.

June 24, 1994.

Stanley A. Stratford, Heather M. McKeever, Dept. of Law, Frankfort, for appellant.

John T. Fowler III, Louisville, for appellee.

Before HOWERTON, JOHNSTONE and McDONALD, JJ.

HOWERTON, Judge.

The Cabinet for Human Resources appeals from an order of the Jefferson Circuit Court dismissing its complaint against Women's Health Services, Inc. (Health Services). The trial court's order of dismissal was based on matters in addition to the pleadings and it must be treated as a summary judgment. We agree with the Cabinet that the trial court erred in determining Health Services is merely a physician's office and not an ambulatory surgical center subject to regulation by the Cabinet. We therefore reverse and remand for further proceedings.

Women's Health Services is owned and operated by Dr. Ronachai Banchongmanie, who is licensed to practice medicine in Kentucky. Dr. Banchongmanie applied for and received a certificate of need (CON), as required for an ambulatory surgical center, in 1988. The CON was subsequently revoked in 1990 when he relocated his facility without approval from the Cabinet. It is claimed by the Cabinet that Dr. Banchongmanie continues to operate and perform procedures beyond what is permissible in a private physician's office. The Office of Inspector General, Division of Licensing and Regulation, completed investigations of Dr. Banchongmanie's facility on April 17, 1990, and on June 12, 1990. Both times it was determined that the center was providing health care services without the necessary license. Based on these findings, the Cabinet instituted this action for permanent injunctive relief and penalties pursuant to KRS 216B.050, and KRS 216B.990.

A temporary injunction was entered on September 20, 1990, after the trial court found the facility to be an unlicensed ambulatory surgical center. This injunction was amended on November 1, 1990, to allow use of the premises to perform uncomplicated abortions without general anesthesia up through the fourteenth week of pregnancy since no license is required to perform such procedures.

Health Services moved to dismiss the action claiming that under KRS 216B.020(3)(a) it was exempt from any license requirements as a private office. The motion to dismiss was accompanied by the affidavit of Dr. Banchongmanie in which he stated that he conducted an OB/GYN specialist practice at his private offices in Louisville and that he regularly delivered children at several hospitals where he has privileges. He further stated that he is qualified to and does perform second trimester abortions in his office.

On February 16, 1993, the court issued an order dismissing the action based on Dr. Banchongmanie's affidavit and the fact that it believed the depositions tendered by the Cabinet did not overcome the assertions made in that affidavit. The court concluded that, pursuant to KRS 216B.020(3)(a), Health Services was not required to obtain a CON from the state. It is from that order this appeal is prosecuted.

■ CR 12.02 and CR 12.03 require that a motion in which matters outside the pleadings are considered is to be treated as a motion for summary judgment. *Craft v. Simmons,* Ky.App., 777 S.W.2d 618 (1989). Here, Health Services filed an affidavit in support of its motion to dismiss. This affidavit was considered by the court to be determinative of the issue; therefore, the accompanying motion must be treated as a motion for summary judgment under CR 56.

■ The Cabinet claims there is a disputed material issue as to whether Health Services is a private physician's office or an ambulatory surgical center, thus summary judgment was inappropriate. We agree.

Under KRS 216B.040, KRS 216B.105, and KRS 216B.042, the Cabinet is charged with regulating health facilities and health services, including the classification of health facilities and health services according to type, size, range of services, and level of care. Pursuant to these enabling statutes, the Cabinet promulgated 902 KAR 20:106 Section 2, which contains the definition of "ambulatory surgical center". It states as follows:

> Section 2. Scope of Operation and Services. *Ambulatory surgical centers are* public or *private institutions that are* hospital based or *freestanding, operated under the supervision of an organized medical staff and* established, equipped, and *operated primarily for the purpose of treatment of patients by surgery, whose recovery under normal circumstances will not require inpatient care.* (Emphasis ours.)

KRS 216B.020(3)(a) exempts a physician's private office from this licensing regulation. Specifically it states: "(3) Nothing in this chapter shall be construed to authorize the licensure, supervision, regulation, or control in any manner of: (a) Private offices and clinics of physicians, dentists, and other practitioners of the healing arts[.]"

Had the Cabinet moved for summary judgment in the trial court, we are convinced that the evidence more nearly supports a decision

in its favor. 902 KAR 20:106 Section 2 requires surgical centers that are "established, equipped, and operated *primarily* for the purpose of treatment of patients by surgery, where recovery under normal circumstances will not require inpatient care" to be licensed. (Emphasis added.) Although Dr. Banchongmanie has his private office at his Health Services building, and he may at times perform some general OB/GYN office practice, the record is replete with testimony that proves that Health Services was established, equipped, and operated *primarily* for surgical treatment (i.e., first and second trimester abortions). There was testimony from Burnice White, a nurse consultant, from the Cabinet that during an inspection in 1990, she encountered 20–25 women clad only in robes sitting in the waiting room at Health Services. Part of her testimony that is relevant here reads as follows:

Q. Why wasn't it considered, his office, a private physicians's office in 1990?

A. Because he had a preop room and it was labeled preop on the door. He had an OR room that was labeled OR, the staff identified a scrub room for us and identified an instrument room, and they had sterilization equipment that came from a hospital, operating room that they used to sterilize equipment and for storage, and they had what they called a postanesthesia room in addition to a recovery room that had recliners.

Q. Explain to me the importance of the anesthesia room in relation to the ambulatory surgical center, what difference does it make whether he had an anesthesia room or not?

A. Well, if he was in a private practice he would not need any of those rooms really. He wouldn't need a preop, wouldn't need an OR, would not need a postop and would not need a anesthesia recovery room.

Q. Explain to me, if you can, citing any regulations, anesthesia and the practice of using anesthesia in ambulatory surgical centers.

A. According to the Kentucky Administrative Regulations Service in 1992, Volume 7, under Surgical Services, Section Five, it says, "The center shall provide treatment of patients by surgery, whose recovery under normal circumstances will not require inpatient care," and number 14 under that section it says, "In all cases other than those requiring only local infiltration anesthetics, a physician anesthesiologist or physician anesthetist or dentist anesthetist (or a registered nurse anesthetist acting under the direction of the operating surgeon) shall administer the anesthetics and remain present during the surgical procedures and until the patient is fully recovered from the anesthetics."

Q. So are you saying if the physician is only using a local anesthetic, that that is one of the factors you look at to determine—

A. They would not need those rooms because they would not be giving sedation requiring anesthetic, anesthesiologist.

Q. So when you saw the anesthesia room there then you presumed that he was using an anesthesiologist?

A. I knew he was using an anesthesiologist because I met him.

Q. You met the anesthesiologist?

A. Yes, I did, and he identified himself as the anesthesiologist.

Q. So a private physician's office would not be classified as an ambulatory surgical center if it's only using local anesthetic then, is that what you're telling me?

A. To the best of my knowledge.

Q. Is that one of the distinguishing factors between an ambulatory surgical center then if it uses a different anesthetic besides a local anesthetic?

A. Yes.

There was additional evidence in the record to indicate that at times as many as 600 abortions were performed at Health Services in one month.

In reviewing this case, we are mindful of the purposes leading to the promulgation of 902 KAR 20:106. One of those stated purposes is to ensure that these centers are sanitary and safe for the patients who use them. In her testimony, Ms. White enumerated many instances in which Health Services was in violation of the sanitation standards to be met by ambulatory surgical centers.

We might add that these were basic requirements of cleanliness and sterility that any doctor's office should meet. Dr. Banchongmanie's pronouncement that his facility meets the state standards for a physician's office is of little comfort considering White's testimony.

■ As previously noted, the trial court's determination had to be treated as a summary judgment. Summary judgment should not be granted unless the right to judgment is shown with such clarity that there is no room for controversy, and it appears impossible for the nonmoving party to produce evidence at trial warranting judgment in his favor. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, Ky., 807 S.W.2d 476 (1991). Clearly, the Cabinet presents genuine issues of material facts, and Health Services is in no way entitled to judgment as a matter of law. Furthermore, as earlier indicated, if nothing additional is put in the record, we would be inclined to grant judgment for the Cabinet.

The judgment of the Jefferson Circuit Court is reversed and the case is remanded for further proceedings.

JOHNSTONE and McDONALD, JJ., concur and each files a separate opinion.

McDONALD, Judge, concurring by separate opinion.

I join in the full text of Judge Howerton's majority opinion, but write additionally from the perspective that the issue needs further comment.

Abortionist Banchongmanie argues that he, under law, is permitted to practice his business of exterminating unborn children without government's interference in the privacy of his office and without a certificate of need from the state licensure agency. He claims to have performed thousands of abortions. Banchongmanie nonchalantly treats the procedure involved on par with removing a wart, when in fact the procedure causes a death.

In Banchongmanie's brief before this Court, he states that the Commonwealth is attempting to overrule *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Such argument is absurd because the Commonwealth as a "several" state has no power to overrule *Roe v. Wade, supra*, a case emanating from our U.S. Supreme Court.

It is my belief though that eventually the majority opinion of *Roe* will be buried as an atrocity and rightfully recognized as one of the most immoral laws of humankind, comparable to the holding in *Dred Scott v. John Sandford*, 60 U.S. 393, 19 Howard 393, 15 L.Ed. 691 (1856), and the 1935 Nurenberg Laws of the German Third Reich.

In *Scott v. Sandford*, our U.S. Supreme Court when addressing the personhood of African Americans said that constitutionally they are "... beings of an inferior order...." Constitutionally, African Americans will be treated as "an ordinary article of merchandise and traffic...." *Id.* at 60 U.S. at 407.

Under the German Third Reich, its Reichstag passed the 1935 Nurenberg Laws which, under Article 2 of the Enabling Act for purposes of racial hygiene, referred to the personhood of Jews as sub-human, an "inferior race," so as to prevent racial defilement of German blood.

The law created in *Scott* and the Nurenberg Laws at least granted some status to the persons involved, repugnant as it was. African Americans were classified not as citizens but as property, and Jews were reduced to a condition of being not quite human. In *Roe*, the personhood of the unborn child is relatively ignored.

Although our law permits a mother to take the life of her unborn child, it should not be done totally without safeguards, due process or provision for a guardian-ad-litem. I note that, under KRS 205.510(3), the status of an "unborn child" is recognized, and in the case of *Rice v. Rizk*, Ky., 453 S.W.2d 732 (1970), "a viable fetus is a person ..." within the meaning of the law. Accepting what has just been established then, abortions without regulation are no more legal and safe than are lynchings.

In my opinion, for an abortionist to carry out infanticidal procedures in his private office without a certificate of need is contrary to applicable and reasonable regulation.

The Cabinet for Human Resources is entitled to a trial on the merits of the application for permanent injunction as determined by the majority opinion.

JOHNSTONE, Judge, concurring by separate opinion.

Albeit reluctantly, I concur in the majority's opinion that the trial court's consideration of matters outside the pleadings in its ruling on the motion to dismiss requires us to consider the motion as one for summary judgment. And, trial courts have become painfully aware of the stringent standard for summary judgment imposed by our Supreme Court in *Steelvest, Inc. v. Scansteel Service Center, Inc.*, Ky., 807 S.W.2d 476 (1991).

However, it is my opinion that the majority's holding need go no further than to conclude that there are genuine issues of material fact which must be resolved by the circuit court. Despite the good intentions of my colleagues, I see little value in a commentary on the evidence currently in the record for a seasoned trial judge.