# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

# $\mathfrak{Supreme\ Court\ of\ Kentucky}$

## 2016-SC-000328-I

EUBANKS & MARSHALL OF LEXINGTON,                          MOVANT
PSC, D/B/A EMW WOMEN'S CLINIC OF
LEXINGTON


                    ON REVIEW FROM COURT OF APPEALS
V.                          CASE NO. 2016-CA-000444
                  FAYETTE CIRCUIT COURT NO. 16-CI-00813


COMMONWEALTH OF KENTUCKY, EX                          RESPONDENT
REL. CABINET FOR HEALTH & FAMILY
SERVICES


## OPINION AND ORDER OF THE COURT

## DENYING INTERLOCUTORY RELIEF

Kentucky law requires all health facilities where abortions are performed to be licensed by the Cabinet for Health and Family Services. But state law exempts the private offices or clinics of physicians from any licensure requirements. The Cabinet filed suit in circuit court seeking to enforce the abortion-facility licensure requirement upon EMW Women's Clinic of Lexington, Kentucky, which had provided abortion services for several years as a private physicians' office with the Cabinet's approval. The Cabinet also moved the circuit court for a temporary injunction directing EMW to stop performing

1

abortions until a determination of its legal status as an abortion facility or a private physician's office. The circuit court denied the temporary injunction. But the Cabinet requested and received interlocutory relief from the Court of Appeals, which reversed the circuit court's decision and issued a temporary injunction itself. The question before us is whether the Court of Appeals abused its discretion by reversing the circuit court and enjoining the operation of EMW pending the outcome of the litigation over the licensure dispute. We hold it did not.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Eubanks & Marshall of Lexington, PSC, d/b/a EMW Women's Clinic (EMW) formed in 1989 and has operated as a women's care center in Lexington ever since. The practice is now owned by Dr. Ernest Marshall, and he has been the sole owner since his partner, Dr. Eubanks, died in 2013. Dr. Marshall is board certified in obstetrics and gynecology, and the practice once offered medical services in those related fields. The practice, during much of its history—particularly before Dr. Eubanks's death—accepted patients for routine women's health services such as performing Pap tests and providing contraception.

EMW also routinely performs early-stage abortions. It performs both medical abortions (abortions induced through oral pharmaceuticals) and surgical abortions (physical removal of the fetus) for women who are up to twelve weeks' gestation. Women choosing to terminate a pregnancy beyond twelve weeks' gestation are referred to EMW's Louisville office, which offers more comprehensive advanced-stage procedures. Abortion services were once

2

just one among an array of women's healthcare services offered by EMW, but since Dr. Eubanks's death, abortion has predominated EMW's business. Despite being one of only three abortion providers in Kentucky, on the advice of counsel, Dr. Marshall chose not to seek licensure as an abortion clinic under the theory that his practice was statutorily exempt as a private physician's office.

On February 17, 2016, Lori Heckell and Elizabeth Richards, two surveyors from the Cabinet responded to an anonymous complaint that EMW exists solely as an abortion provider, rendering it ineligible for the private-practice exemption. Heckell and Richards visited the clinic and inspected it, inquiring into its ownership and its licensure. This was the first Cabinet visit to the clinic since 2006.

During the visit, the surveyors learned that Dr. Marshall was the sole owner of the facility, although the employees could not offer documentary proof at the time. But more importantly, the surveyors learned that abortions and related procedures were the only medical services the clinic actually performed. They also learned that EMW was not licensed as an abortion clinic. After gathering this information, the surveyors asked for and received consent to inspect the premises.

Upon inspection, the surveyors found what they perceived to be unsafe and unsanitary conditions. The examination table was in a dilapidated condition, its upholstery torn and patched with tape. Layers of dust, dirt, and grime covered medical equipment and instruments in the facility, prompting the surveyors to speculate that it had not been cleaned in weeks. The Autoclave machine—a machine used to sterilize medical instruments—had apparently

3

not been cleaned for months, despite manufacturer instructions that it must be cleaned weekly. Oxygen tanks had a noticeable dust buildup. The facility's intubation kit—a medical device used to force air into a patient's lungs in the event she is unable to breathe on her own—lacked an Ambu bag, rendering it useless. And the cabinets were filled with expired medications with labels yellowed with age. Some medication in stock had been expired for nearly twenty years.

The information about the nature of EMW's current practice and the on-site inspection by its surveyors led the Cabinet to conclude that EMW was not really a private physician's office but instead was an abortion clinic—and a dangerously unsanitary one at that. The Cabinet then filed suit in circuit court seeking penalties against EMW for operating an unlicensed abortion clinic and a cease-and-desist order to stop it from performing abortions until it was appropriately licensed. EMW never responded to the Cabinet's complaint, so the Cabinet moved to temporarily enjoin EMW from operating its Lexington clinic until it receives appropriate licensure from the Cabinet as an abortion clinic.

EMW eventually did respond to the temporary injunction motion, and the circuit court conducted an evidentiary hearing. The hearing included testimony from both Cabinet surveyors, EMW employees, and EMW owner-physician Dr. Marshall. During his testimony, Dr. Marshall admitted that EMW only performs abortions and that he closed his private practice in 2011. Yet Dr. Marshall insisted that EMW is exempt from abortion-facility licensure requirements; he still considers it a private physician's office because EMW

*offers* other women's health services. And the record reflects that in 2006, a Cabinet assessment labeled his clinic as such.

After two days of hearings, the circuit court denied the temporary injunction motion. The circuit court concluded that the Cabinet had not demonstrated a "likelihood of success on the merits" and that equitable considerations for women seeking abortions prevented the court from issuing the injunction. The circuit court rested its decision heavily on the type of abortion procedures performed at EMW Lexington—first trimester abortions requiring little to no anesthesia. The Cabinet then sought interlocutory relief in the Court of Appeals.

The Court of Appeals reversed the circuit court's order and granted the Cabinet's motion for interlocutory relief by enjoining EMW from performing abortions at its Lexington facility until the underlying case reaches final judgment or EMW obtains an abortion-facility license from the Cabinet. The appellate panel determined that the circuit court had misapplied the legal principles relevant to assessing the Cabinet's claims and that its order denying temporary injunctive relief to the Cabinet was unsupported by proper legal considerations. EMW now seeks relief in this Court from the Court of Appeals' order.

## II. ANALYSIS.

Abortion is likely the most divisive issue in a divisive political culture. We understand that the issues of abortion and access to those procedures stoke the passions of the collective body politic like no others, but we hope to reassure the public that today's opinion is about neither of those issues.

5

Instead, this case involves the applicability of state statutes to a particular party—state statutes that have not been challenged in this case as incongruous with any overarching federal law.

The United States Supreme Court has consistently held that the "State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient."[1] And this is true so long as the state statute does not have the "effect of placing a substantial obstacle in the path of a woman's choice."[2] And "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right."[3] So the nation's high court has continually recognized a state's right to regulate abortions to the extent it relates to legitimate interests of public health. Kentucky is among those states with a series of laws and regulations designed to ensure these procedures are performed under the same hygienic standards it imposes on other medical procedures.

Today's case does not ask us to declare when life begins or to what extent the state may prevent a woman from terminating a pregnancy. We wish to be clear at the outset that this case is not about the right to abortion. It does not involve any constitutional challenges to any state statute or regulation. No party questions the legitimacy of the law in its current form nor the licensing

---

[1] *See Whole Women's Health v. Hellserstedt*, 136 S.Ct. 2292, 2309 (2016) (quoting *Roe v. Wade*, 410 U.S. 113, 150 (1973)).

[2] *Id.* (quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833. 877 (1992)).

[3] *Casey*, 505 U.S. at 878.

requirement for abortion clinics in effect since 1999—requirements equally applicable to ordinary healthcare facilities and ambulatory surgical centers.

In contrast, this case is about the availability of equitable relief. It is fairly undisputed that EMW was operating a potentially unsafe medical facility. The essential question before us is whether evidence in the record supports the Court of Appeals' issuance of a temporary injunction ordering EMW to stop performing abortions until it receives an abortion-facility license from the Cabinet or until the resolution of the underlying litigation on the merits pending in circuit court. Our review necessarily requires us to preview the merits of the Cabinet's claim, but we again wish to be doubly clear that our statements today are in no way to be taken as this Court's definitive position on whether or not EMW Lexington is legally considered an abortion clinic operating without proper licensure. In simple terms, we are only reviewing the prudence of a temporary injunction based on statutory law and prior court precedent, not whether or not EMW is in fact an abortion clinic.

As a threshold matter, we agree with the circuit court and the Court of Appeals that the Cabinet can pursue this claim in the courts. EMW argues that the Cabinet should have brought its claim first in administrative tribunals rather than a court of law and that its failure to exhaust the administrative process bars judicial review. But KRS 216B.040(1)(d) extends to the Cabinet authority to "enforce, through legal actions on its own motion, the provisions of this chapter and its orders and decisions issued pursuant to its functions." So we are thoroughly satisfied this case is well within our jurisdiction for review.

7

## A. Standard of Review.

This case comes to us by EMW's motion for relief under CR 65.09. That rule allows "any party adversely affected by an order of the Court of Appeals in a proceeding under Rule 65.07 or Rule 65.08" to move the Supreme Court to vacate or modify the Court of Appeals' ruling. But "such a motion will be entertained only for extraordinary cause shown in the motion."[4] As the movant in this case, EMW bears the "enormous burden" of proving extraordinary cause in setting aside the Court of Appeals' ruling.[5]

Appellate review of the issuance of a temporary injunction is examined for an abuse of discretion.[6] So the injunction will not be dissolved unless we conclude that the decision below was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[7] Indeed unless the issuing court has abused its discretion, this Court is powerless to set aside a temporary injunction.[8]

An abuse of discretion is recognized by this Court as an "extraordinary cause" worthy of review under CR 65.09.[9] And to be sure, even an inquiry into whether the lower court abused its discretion has been considered worthy of substantive review, even if we ultimately determine no such abuse took place.[10] So in that sense, we agree with EMW that extraordinary cause exists for us to

---

[4] CR 65.09. *See also National Collegiate Athletic Ass'n v. Lasege*, 53 S.W.3d 77, 84 (Ky. 2001).

[5] *Courier-Journal, Inc. v. Lawson*, 307 S.W.3d 617, 620 (Ky. 2010).

[6] *See Maupin v. Stansbury*, 575 S.W.2d 695, 698 (Ky. App.1978).

[7] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

[8] *Maupin*, 575 S.W.2d at 697.

[9] *See Lasege*, 53 S.W.3d at 84.

[10] *See Gharad v. St. Claire Medical Center, Inc.*, 443 S.W.3d 609 (Ky. 2014).

8

review this case, and we will conduct the ensuing analysis to determine whether the Court of Appeals abused its discretion in both reversing the circuit court's denial of temporary injunctive relief and issuing its own injunction.

Under Kentucky law, a court may issue a temporary injunction if the movant's "rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss, or damage pending a final judgment in the action, or the acts of the adverse party will tend to render such final judgment ineffectual."[11] We endorsed the approach taken in *Maupin v. Stansbury* to test the appropriateness of injunctive relief by satisfying three essential elements: (1) that the moving party can show an irreparable injury; (2) that the issuance of a temporary injunction is not inequitable; and (3) that the moving party has a substantial possibility of prevailing on the merits.[12]

So we will now review this case for abuse of discretion using each of the *Maupin* factors. We choose to begin our analysis with the third factor.

### B. There is a Substantial Question on the Merits.

The third *Maupin* factor prohibits a temporary injunction absent a finding that a substantial question on the merits exists. In *Norsworthy v. Kentucky Board of Med. Licensure*, we held that a party seeking a temporary injunction must show a substantial question exists that "tends to create a *substantial possibility* that the Appellant will ultimately prevail on the merits."[13] Although we cannot fully address the merits of the present case, this *Maupin* factor requires us to handicap the Cabinet's chances of prevailing. And

---

[11] CR 65.04.

[12] *See, e.g., Maupin,* 575 S.W.2d at 699.

[13] 330 S.W.3d 58, 63 (Ky. 2009) (emphasis added).

9

after a comprehensive review of Kentucky statutory law and precedent, we are confident there is enough substance to the Cabinet's underlying claim reasonably to foresee its success on the merits.

The circuit court relied heavily on this *Maupin* factor and concluded that EMW has a "strong argument that it is exempt from licensing pursuant to the private office provision." The circuit court's conclusion here necessarily discounts the Cabinet's likelihood of success on the merits. The circuit court supported this conclusion by observing that the types of abortion procedures performed at EMW and the equipment on hand were not characteristic of licensed abortion facilities. The trial court also noted that the clinic conformed with "the most important regulations of a licensed abortion facility" anyway.

The Court of Appeals justified its reversal of the circuit court's ruling by concluding that the trial judge misapplied the law on this point. And indeed a ruling unsupported by sound legal principles is a valid reason for finding an abuse of discretion in a lower court. The appellate panel then found that under its understanding of the private-physician exemption to the licensing requirement EMW's status was highly doubtful, supporting the displacement of the circuit court's original ruling. We will thoroughly review all of those relevant provisions again today.

## 1. *Chapter 216B Licensure Requirements.*

KRS Chapter 216B details requirements for the licensure and regulation of health facilities and services in the Commonwealth. The licensure requirement of health facilities and health services is "a means to insure that the citizens of this Commonwealth will have safe, adequate, and efficient

10

medical care."[14] The statute goes on to declare that "no person shall operate any health facility in this Commonwealth without first obtaining a license issued by the cabinet, which license shall specify the kind or kinds of health services the facility is authorized to provide."[15] A "health facility" is robustly, but not definitively, defined as follows:

> "Health facility" means any institution, place, building, agency, or portion thereof, public or private, whether organized for profit or not, used operated, or designed to provide medical diagnosis, treatment, nursing, rehabilitative, or preventative care and includes alcohol abuse, drug abuse, and mental health services. This shall include but shall not be limited to health facilities and health services commonly referred to as hospitals, psychiatric hospitals, physical rehabilitation hospitals, chemical dependency programs, tuberculosis hospitals, skilled nursing facilities, nursing facilities, nursing homes, personal care homes, intermediate care facilities, family care homes, primary care centers, rural health clinics, outpatient clinics, ambulatory care facilities, ambulatory surgical centers, emergency care centers, emergency care centers and services, ambulance providers, hospices, community centers for mental health or individuals with an intellectual disability, home health agencies, kidney disease treatment centers and freestanding hemodialysis units, facilities and services owned and operated by health maintenance organizations directly providing health services subject to certificate of need, and others providing similarly organized services regardless of nomenclature.[16]

Although that definition includes an extensive array of medical services, abortion services are not listed there. That is because abortion facilities are dealt with separately in the statutory framework. For KRS 216B purposes, an "abortion facility" is defined as "any place in which an abortion is performed."[17] An abortion facility, like generic health facilities, requires appropriate licensure

---

[14] KRS 216B.010.

[15] KRS 216B.105(1).

[16] KRS 216B.015(13).

[17] KRS 216B.015(1).

11

from the Cabinet.[18] But unlike generic health facilities, abortion facilities must also have written agreements between the facility and both acute-care hospitals and ambulance services.[19]

The statute does not explicitly define "abortion" for purposes of licensure, but the definition provided in other abortion-regulation statutes reflects other cross-references in the Kentucky statutory scheme and is consistent with our case law understanding of the term. There, "abortion" is defined as "the use of any means whatsoever to terminate the pregnancy of a woman known to be pregnant with intent to cause fetal death." One noticeable aspect of this definition is that it does not create different classes of abortions. It does not differentiate among the types of procedures performed to achieve the ultimate result of terminating a pregnancy. Indeed, the statute makes no distinction whether there was general anesthesia used, local anesthesia used, or no anesthesia used at all. Our operative definition of abortion under Kentucky law sees no difference between medical abortions and surgical abortions.

This is exemplified by the use of "any means necessary" to describe the method of carrying out the procedure. It is clear that our law treats abortion as its own class of treatment, making no distinction between the use of pharmaceuticals and surgical procedure. So we are constrained to agree with the Court of Appeals that the circuit court erroneously considered the nature of

---

[18] KRS 216B.0431. *See also* KRS 216.990(1) ("Any person who, in willful violation of this chapter, operates a health facility or abortion facility without first obtaining a license...shall be fined not less than five hundred dollars ($500) nor more than then thousand dollars ($10,000) for each violation."); KRS 216B.042(1)(c) ("The Cabinet shall...Establish licensure standards and procedures to ensure safe, adequate, and efficient abortion facilities...").

[19] KRS 216B.0435.

the predominant procedures at EMW and its use of only mild anesthesia as relevant factors. There is nothing about the degree of difficulty of the abortion procedures performed at EMW that can save the clinic from being labeled an abortion facility. The fact that even one abortion is performed there is enough under our statute for the abortion-facility label to apply. Only activity *other than abortions* can aid EMW in evading the licensure requirements necessary for abortions.

The definition of an abortion facility in Chapter 216B is remarkably broad and all-encompassing. EMW Lexington admittedly performs abortions and is not licensed as an abortion facility. The statute declares that any place that an abortion is performed is an abortion facility and such facilities must be licensed. So absent EMW's classification as a facility exempt from licensure, we must start our analysis with the presumption that EMW is in fact an abortion facility.

### 2. *The Private Physician Office Exemption.*

EMW claims to rely on one such exemption. In the same provision outlining the basic licensure requirement for Kentucky healthcare facilities, Chapter 216B also declares that "Nothing in this chapter shall be construed to authorize the licensure, supervision, regulation, or control in any manner of...*Private offices and clinics of physicians,* dentists, and other practitioners of the healing arts..."[20] The statute fails to define this classification of medical facilities. But there are some key inferences that can be drawn from the text. First is that use of "nothing in this *chapter*" signifies that the exemption applies

---

[20] KRS 216B.020(2)(a) (emphasis added).

equally to both regular healthcare facilities and abortion facilities—meaning that this private-office exemption contains some key quality distinct from either definition that is comprehensively defined under state law. So there must be some attribute that makes this class of facility different from the two other highly regulated categories. And we know that simple private ownership does not suffice. The definition of "health facilities" under Kentucky law encompasses facilities either "public or private."[21]

So what then is a private physician's office or clinic? What makes these offices different? That is the most critical issue in this case. Absent proof that EMW falls within this exemption, the clinic is logically labeled an abortion facility under KRS 216B.015(1). We have never addressed an issue seeking an interpretation of this licensure exemption. But we find three published opinions from the Court of Appeals that weighed-in on this matter. And most of them involved underlying facts unrelated to the highly charged abortion issue we face now. So we will review each prior holding.

But before doing that, we wish to be clear that we are not making a rule for the private-physician office exemption today. It is only fair to the parties to hold them to the state of the law—or a reasonable interpretation of current law—at the time this matter commenced. It is indeed possible that when this case is addressed on the merits it may be necessary to find definitively the meaning of this exemption under Kentucky law, and our rule or analysis may vary from the Court of Appeals' test that exists today. But in handicapping the Cabinet's chances of prevailing on the merits solely for purposes of deciding to

---

[21] KRS 216B.015(13).

issue a temporary injunction, we will not engage in creating our own rule to bind the parties. With that notion in place, we will consider the Court of Appeals' prior holdings on this issue.

The Court of Appeals first addressed this issue in *Cabinet for Human Resources v. Women's Health Services, Inc.*[22], a case whose facts draw noticeable parallels to today's issue. There, the Cabinet also sought injunctive relief against Women's Health Services for operating an allegedly unlicensed ambulatory surgical center that performed abortions. The facility performed abortions without general anesthesia and had the requisite Certificate of Need prior to a change of location. The trial court dismissed the complaint under the theory that the clinic fit the private-physician-office exemption.

The Court of Appeals reversed, holding that there was a genuine issue of material fact as to whether Women's Health Services was a private physician's office or an ambulatory surgical center. This analysis did not invoke the "abortion facility" definition from Chapter 216B but instead focused on the ambulatory-surgical center classification, with licensure equally required as a "health facility." The panel reached its conclusion by inquiring into the primary purpose of the facility.[23] Because there was ample evidence in the record indicating that the primary activity of the clinic was consistent with that of an ambulatory surgical center—which required licensure—the panel determined that circuit court improperly dismissed the Cabinet's complaint.

---

[22] 878 S.W.2d 806 (Ky. App. 1994).

[23] *Id.* at 809 ("...the record is replete with testimony that proves that Health Services was established, equipped, and operated *primarily* for surgical treatment.") (emphasis in original).

15

The Court of Appeals next addressed this exemption in *Gilbert v. Cabinet for Health and Family Services.*[24] There, the Court of Appeals affirmed a circuit court ruling that a physician-owned corporation offering MRI services did not qualify for the private-office exemption from state licensure laws. The panel reaffirmed that the party seeking the exemption bears the burden of proof that his clinic is exempt from Chapter 216B; it is not the Cabinet's duty affirmatively to prove the clinic is *not* exempt.[25] And the analysis began by holding that private ownership is not a dispositive factor in attaining this exempted status—to do so allows any physician in the Commonwealth to "ignore Chapter 216B altogether as long as he owned the building containing the health facility or where the health services are provided."[26]

The analysis appeared to parallel that in *Women's Health Services* with respect to the search for Dr. Gilbert's primary purpose. The panel held that the evidence proffered "had every appearance that they were something other than the private offices or clinics of a physician—specifically, they had all the hallmarks of a diagnostic testing facility."[27] Indeed, the appellate court believed that "availability of the private office exemption in this case, and in any case, depends on the kind of activity that actually takes place at the office for which the exemption is sought."[28] So *Gilbert* reaffirmed the importance of the nature

---

[24] 291 S.W.2d 712 (Ky. App. 2008).

[25] *Id.* at 717.

[26] *Id.*

[27] *Id.* at 719.

[28] *Id.* at 717.

of the activity conducted at the office in question as a crucial consideration in determining the availability of the exemption.

But as part of that analysis into a clinic's activity, the *Gilbert* court felt that the nature of the office's business activity was an important part of that evaluation. The panel held that while the evidence presented "does not describe a private office or clinic of a physician...It does, however, describe a facility which performs diagnostic testing on patients, who, but for their referral to these MRI testing facilities by their own treating physicians, would have no connection to [ [Dr. Gilbert's] medical practice."[29] The panel therefore suggests that a private physician's office is not one whose business is derived primarily from outside referrals from other doctors. Instead, organic referrals through the physician-owner's own practice are more characteristic of the office contemplated by the exemption. The panel seemingly focused on the fact that outside patients presented to Dr. Gilbert's clinic solely for a specific service on referral from another office—not for treatment from Dr. Gilbert as a primary physician.

The *Gilbert* analysis was refined in the Court of Appeals' final ruling on this issue in *Fleming County Hospital Dist. v. Fleming Regional Imaging, PLLC.*[30] There, the *Gilbert* test for a private-physician office was summarized into three factors. The facility may or may not be exempt, depending on: (1) the ownership of the facility; (2) the activity that takes place in the facility; and (3) the source of patient referrals to the facility.[31] The *Fleming County Hospital*

---

[29] *Id.* at 718.

[30] 354 S.W.3d 149 (Ky. App. 2011).

[31] *Id.* at 157.

panel also reaffirmed the *Gilbert* panel's position on referrals and their relevance to qualification for the exemption. In ruling that the exemption applies in this case, the panel found that the majority of patients presenting to this clinic were referred there by one of its physician-owners and that those physicians would be present and performing those services for patients.[32]

So in light of these Court of Appeals opinions, we are comfortable in determining that the present state of the law in defining the private-physician-office exemption is essentially an inquiry into the primary purpose of the clinic as first articulated in *Women's Health Services*. And to discover that purpose, reviewing courts should consider the three factors supported by both *Gilbert* and *Fleming County Hospital*: the clinic's ownership, the type of activity actually conducted, and the nature of the clinic's business. So we will now turn to EMW and attempt to evaluate its status under those factors.

### 3. *Applicability of the Exemption to EMW.*

In consideration of the evidence in the record, there is ample reason to believe that EMW has failed to establish its likelihood of proving its status as an exempted facility. In turn, we think there is a substantial possibility the Cabinet may succeed in proving the clinic is an unlicensed abortion facility.

Like MRI services in *Gilbert*, EMW almost exclusively engages in conduct highly regulated under state law—the precise type of activity Chapter 216B contemplates in requiring licensure. It is an unchallenged fact in this case that EMW Lexington performs only abortions and related procedures. Since the death of Dr. Marshall's partner in 2013, EMW has no record of providing the

---

[32] *Id.*

18

other forms of gynecological care it claims to offer. We do not think it would be unreasonable for a reviewing court of law to conclude definitively that EMW Lexington has "all the hallmarks" of an abortion facility given the exclusive nature of those services performed in the clinic.

Likewise, the nature of referrals to the clinic supports that inference. At the evidentiary hearing, Dr. Marshall indicated that most women turn to EMW through internet searches or word-of-mouth referrals from former patients. We think it is fair under the current state of the record for a court to find that EMW is a standalone business, independent of Dr. Marshall's—or any other EMW physician's—own medical practice. In fact, we are unsure that Dr. Marshall has any medical practice apart from abortions. The record paints a clear picture that EMW's business is not derivative of any organic source of medical services; it appears the majority of clinic patients are new patients previously untreated by any EMW physicians seeking one particular type of service and that service alone.

Ultimately, the Cabinet is likely to succeed on the merits. EMW has failed to demonstrate why it should be exempt from licensure as an abortion facility. An abortion facility is anywhere an abortion is performed, regardless of what type of abortion is offered or the relatively light anesthesia necessary to conduct the procedure. EMW exists solely to perform abortions and offers little to no proof it does anything else other than performing that service in potentially substandard conditions, proving precisely why the Commonwealth requires these facilities to be licensed in the first place. So we do not think the Court of Appeals abused its discretion in finding the Cabinet has established a substantial question.

19

## C. An Irreparable Injury Exists.

The *Maupin* test instructs courts to determine whether the moving party demonstrated an irreparable injury.[33] The *Maupin* court further elaborated, suggesting that a substantial claim to a personal right must be abrogated, and urgent need for relief must be demonstrated."[34] Placing this sense of urgency in perspective, "an injunction will not be granted on the ground merely of an anticipated danger or an apprehension of it, but there must be a reasonable probability that injury will be done if no injunction is granted."[35] "The clearest example of irreparable injury is where it appears that the final judgment would be rendered completely meaningless should the probable harm alleged occur prior to trial."[36]

In *Boone Creek Properties, LLC v. Lexington-Fayette Urban County Board of Adjustment*, we tweaked the irreparable-injury analysis for government bodies seeking to enforce the law duly passed by the legislature.[37] In cases where a government entity seeks an injunction to enforce its police powers, irreparable harm is presumed to exist.[38] This is based on the "self-evident notion that if a governmental unit enacts a law...and the government cannot promptly compel compliance by enjoining an ongoing violation, the power and dignity of that governmental body is diminished."[39] So the irreparable harm in

---

[33] *Maupin*, 575 S.W.3d at 698.

[34] *Id.*

[35] *Id.* (quoting *Hamlin v. Durham*, 32 S.W.2d 413, 414 (Ky. 1930)).

[36] *Id.*

[37] 442 S.W.3d 36 (Ky. 2014).

[38] *Id.* at 40.

[39] *Id.*

20

these cases is the "genuine but intangible harm relating to the power and right" of a governing body to enforce the laws the legislature promulgates.[40]

*Boone Creek Properties* makes clear at the outset that governmental bodies seeking a temporary injunction are entitled to a rebuttable presumption of irreparable injury. But while the opinion so clearly set forth the justification for this rule, it left the precise nature of *how* an opposing party may rebut that presumption to future courts to flesh out *ad hoc.*

The circuit court in its order denying the Cabinet's motion failed to address this aspect of the *Maupin* analysis altogether—perhaps because it was well aware of the *Boone Creek Properties* presumption, but more likely because it found the other factors dispositive in denying the Cabinet's request. But the Court of Appeals did discuss the irreparable-injury requirement and concluded that EMW failed to rebut the government's presumption of injury because it offered no proof whatsoever. We affirm that ruling today under a slightly different legal theory.

But first, we, of course, must determine that the Cabinet is entitled to enjoy this presumption. We are comfortable assuming an irreparable injury to the Cabinet here because it is a governmental agency seeking to enforce the Commonwealth's health-licensure laws. The Cabinet is entrusted by the legislature to enforce the provisions contained in KRS 216B. Certain healthcare operations require licenses to operate legally in the Commonwealth. Abortion facilities are one such example of services requiring a state license. The Cabinet believes EMW Lexington is an abortion clinic operating without a license and

---

[40] *Id.*

21

seeks to enforce that state requirement by enjoining them from operation until such licensure is procured. So we think it is clear that the Cabinet is entitled to the preliminary presumption of irreparable injury so methodically articulated in *Boone Creek Properties*.

On appeal to this Court, EMW makes two points in attempting to rebut this presumption. First is the fact that EMW's status as an exempted facility was recognized by the Cabinet in 2006, only showing a statistical decrease in non-abortion gynecological services provided in the ten-year period since. And second, EMW suggests that the nature of abortions offered by EMW Lexington—mostly either medical abortions or minor surgical abortions performed with only topical anesthesia—diminishes the risk of irreparable injury. Essentially, this second position suggests that the abortion procedures taking place in the clinic are safe enough and expose the patient to minimal danger of physical harm.

We agree with the Court of Appeals' conclusion that EMW has failed to rebut the Cabinet's presumed injury, but we disagree with the panel that the clinic failed to make an attempt. EMW proffered evidence to consider—albeit proof ultimately irrelevant to the type of harm contemplated by our *Boone Creek Properties* rule. Even if the risk of physical harm to patients receiving abortions at the clinic is relatively low, as EMW claims, that stakes no position on the Cabinet's sovereign authority to seek compliance with what it perceives as an affront to Kentucky statutory law. And likewise, a prior Cabinet's decade-old determination is equally irrelevant to overcome this presumption. Cabinet administration has changed twice since that last inspection ten years ago. And it is undisputed that the services conducted at EMW, as well as the clinic's

22

organization, has changed during that period as well. In the years following the last Cabinet inspection, Dr. Eubanks died and the clinic pivoted to an abortion-centric business model. We see no reason why a Cabinet determination from ten years ago impacts its ability to enforce what it perceives to be a legal violation today—particularly when the activity in question in the current dispute almost solely involves conduct occurring in the time *after* that 2006 inspection.

So we are satisfied that the Cabinet's presumption of irreparable injury remains intact. We reaffirm the applicability of our *Boone Creek Properties* holding, and we can say conclusively that EMW failed to overcome that presumption here. So we affirm the Court of Appeals' ruling on this factor.

## D. The Equities Do Not Weigh Against Issuing the Injunction.

Finally, we must examine equitable considerations, particularly whether the public interest would be harmed by issuing the injunction, or if its effects would merely be to maintain the status quo.[41] Indeed, "in any temporary injunctive relief situation the relative benefits and detriments should be weighed."[42] And further, injunctive relief is improper if it unduly harms others or disserves the public.[43] So essentially, weighing the equities of this case requires us to go beyond the actual underlying legal issue in this case—that is, whether EMW Lexington is an unlicensed abortion facility under Kentucky law—to examine the impact of today's decision of EMW and its patients.

---

[41] *Maupin*, 575 S.W.2d at 698.

[42] *Id.*

[43] *See Price v. Paintsville Tourism Comm'n*, 261 S.W.3d 482, 484 (Ky. 2008).

23

The circuit court determined that the equities weighed against issuing the injunction. The circuit court said that EMW Lexington, as one of only three abortion providers in the Commonwealth, primarily services eastern Kentucky and that closing the facility would have a "severe, adverse impact on women in the Eastern part of the state." And substandard levels of cleanliness expected of facilities where minor surgical procedures occur did not displace the "adverse impact" on women because "the Court cannot imagine that Dr. Marshall would not immediately seek to remedy th[ose] concerns."

The Court of Appeals reached an opposite conclusion. The panel held that there was no evidence in the record of any demographic breakdown of women seeking abortions at EMW Lexington. So the circuit court's conclusion that the injunction would potentially harm the women of eastern Kentucky lacked reliable proof. And with the general purpose of state licensing requirements designed to ensure that abortions occur in a safe and hygienic environment, the panel determined that allowing EMW to continue providing abortion services in the conditions detailed in the record presents a "substantial risk of harm" to the clinic's patients.

This *Maupin* factor requires us to step back and look to the implications of our decision whether to allow the injunction to stand. It is clear the dilemma facing us today is the concern for public health and safety balanced against a Kentucky woman's access to an abortion. But we must carefully avoid the temptation of speculation and reach our conclusion solely on review of facts contained in the record before us. And with that in mind, we cannot say the Court of Appeals abused its discretion in ruling that the equities were not weighted against enjoining EMW from continuing to perform abortions.

24

The record indicates that 3,187 abortions were performed in Kentucky in 2015. Of that number, 3 were performed at Norton Hospital in Louisville, 411 were performed at EMW Lexington, and 2,773 were performed at EMW Louisville. Under the status quo as it existed in 2015, approximately 87 percent of Kentucky abortions were performed by EMW's sister clinic in Louisville. So it stands to reason that an overwhelming majority of women seeking an abortion in Kentucky will not be deterred by this decision either way.

With that said, we do not wish to disparage the 13 percent of women who did seek EMW's abortion services in Lexington. The reality is that if a temporary injunction is issued, EMW Lexington will not be an option until the underlying litigation in this case concludes. But the type and degree of the burden imposed is not clear in the record. We have no doubt that, as the circuit court and EMW contend, the clinic in fact services some clientele from eastern Kentucky—we would be surprised if it did not. We simply do not know the level to which it does. So in a sense we agree with the circuit court and EMW that issuing an injunction would impact Kentucky women, and they would have to seek abortion-related services either in Louisville or outside the state.

But this admitted risk of injury ultimately turns to speculation, and we cannot say it outweighs the very real and evident unsanitary conditions found to exist at EMW Lexington, the facts of which are undisputed.

Despite the confessed difficulties of this analysis, we cannot say the Court of Appeals abused its discretion by holding that the equities did not weigh against issuing the injunction.

25

### III.  CONCLUSION.

For the foregoing reasons we DENY EMW Women's Clinic of Lexington's Motion for Interlocutory Relief and AFFIRM the Court of Appeals' decision vacating the circuit court's order and issuing a temporary injunction in the Cabinet's favor.

IT IS SO ORDERED.

All sitting. All concur.

ENTERED: August 25, 2016.

CHIEF JUSTICE JOHN D. MINTON, JR.